UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

---

ADAM J.  JOHNSTON, an individual,

          Plaintiff,

vs.

CITY OF NEGAUNEE, individually,

and

PATRICK KETOLA, individually, and
in his official capacity of the Chief of Police
of the City of Negaunee

and

CRAIG GRAHOVIC, individually, and
in his official capacity of detective sergeant
of the City of Negaunee

          Defendants.

Case No. 1:23-cv-
Hon.

| | |
|---|---|
| William F. Piper (P38636)<br>William F. Piper, P.L.C.<br>**Attorney for Plaintiff**<br>1611 West Centre Avenue, Suite 209<br>Portage, MI 49024<br>Phone: 269.321.5008<br>Fax: 269.321.5009<br>Email: wpiper@wpiperlaw.com | |

## COMPLAINT

The plaintiff Adam J. Johnston, by and through his attorney William F. Piper, PLC,

for his complaint, states as follows:

### JURISDICTIONAL ALLEGATIONS

1.    This civil action is brought in part pursuant to the Uniformed Services

Employment and Reemployment Rights Act of 1994, Title 38, U.S.C. 4301 *et seq*.

**JURISDICTION AND VENUE**

2.      This court has jurisdiction over the USERRA subject matter of this action under 28 U.S.C. § 1331, and 28 U.S.C. § 1343 and 38 U.S.C. § 323(b).  Venue is proper in this district under 39 U.S.C. 4323(c)(2) and 28 U.S.C. 139(b) because the defendant , City of Negaunee, which is in Marquette County, Michigan, carries out its municipal functions in this judicial district, and it employed the defendants Mr. Ketola and Mr. Grahovic at all times relevant herein.

3.      The events complained of occurred in the City of Negaunee involving the plaintiff's employment by the defendant and its termination of his employment by it on October 18, 2021.

**COMMON ALLEGATIONS**

4.      The plaintiff restates and realleges as though fully set forth herein paragraphs 1 through 3 of this complaint.

5.      The Uniformed Services Employment and Reemployment Rights Act of 1994, enacted October 13, 1994 (Title 38, U.S.C. Chapter 43, Sections 430-4335, Public Law 103-353), as amended, provides for employment and reemployment rights for all unformed service members.[1]

6.       In relevant part, Title 38, U.S.C. 4311(a) prohibits employment discrimination because of past, current, or future military obligations, and this includes most areas of employment, including hiring, promotion, termination and benefits. The protection is afforded to past, current, and those that apply to be, members of any of the branches of the uniformed services, including the U.S. Army Reserves.

---

[1] "USSERRA." United States Department of Labor,
    https://www.dol.gov/agencies/vets/programs/userra/USERRA-Pocket-Guide

7.      In relevant part, Title 38, U.S.C. 4303(2) defines the term "benefit," "benefit of employment," or "rights and benefits" as the terms, conditions, or privileges of employment, **including any advantage, profit, privilege, gain, status, account, or interest** (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice.

8.      Standard and Burden of Proof in USERRA matter: Title 38, U.S.C. 4311(c) dictates, if an individual's past, present, or future connection with the service is a motivating factor in an employer's adverse employment action, the employer has to prove that it would have taken the same action regardless of the individual's connection with the service. **The employer bears the burden of proving that it would have taken the adverse action in the absence of the person's service connection or exercise of any USERRA right.**

9.      Rights Not Based on Seniority in a USERRA matter: Title 38, U.S.C. 4316(b) provides that during a period of service, employees must be treated as if they are on a furlough or leave of absence. Consequently, during their period of service, they are entitled to participate in any rights and benefits not based on seniority that are available to employees on comparable nonmilitary leaves of absence, whether paid or unpaid. If there is a variation in benefits among different types of nonmilitary leave, **the service member is entitled to the most favorable treatment** so long as the nonmilitary leave is comparable.

10.      Double Damages in a USERRA matter: Title 38, U.S.C. 4323(d)(1)(C) provides that the award of back pay or lost benefits may be doubled in cases where violations of the law are found to be "willful." The term "willful" is not defined in the law, but a violation is

considered willful if the employer's conduct was done knowingly or recklessly in disregard of the law.

11.     Fees: Title 38, U.S.C. 4323(h) provides that an award of attorney fees, expert witness fees, and other litigation expenses to successful plaintiffs who retain private counsel may be made at the court's discretion. No court fees or costs may be charged to anyone who brings a suit.

12.     The plaintiff Mr. Johnston, lived in Marquette County, Michigan at the time his USERRA Rights were initially violated, in August 2021. Mr. Johnston currently lives in Racine County, Wisconsin. Mr. Johnston had to move from Michigan to Wisconsin solely due to the actions of the defendants.

13.     The defendant City of Negaunee Michigan is a municipality within the jurisdiction of this Court (Marquette County, Michigan).

14.     On May 16, 2020, Mr. Johnston was hired as a full-time police officer by the City of Negaunee Police Department (NPD), in Negaunee, Michigan. He was suspended by NPD, on August 30, 2021, and officially terminated, by the Negaunee City Manager Nate Heffron ("Heffron"), on October 18, 2021. The termination letter falsely claimed that Mr. Johnston was a probationary employee (due to his military related absences).

15.     As summarized in detail below, in light of the undeniable and suspicious timing, the retaliatory and factually groundless nature of the allegations leveled at Mr. Johnston, as well as the false and misleading information provided by the defendant, the preponderance of evidence will show that Mr. Johnston's rights under USERRA were violated by the defendants, when he was maliciously targeted and falsely accused, both

4

orally and in writing, by NPD Detective Sergeant Craig Grahovic ("Mr. Grahovic"); and treated unfairly and vastly differently from the other officers, by Mr. Grahovic and therefore the defendant City of Negaunee at least in part, if not entirely, due to Mr. Johnston's military service, and in particular his military related absences.

16.    As a direct result of Mr. Grahovic's targeting of Mr. Johnston, in which he falsely accused Mr. Johnston of lying, with no witnesses, about a non-issue, for no reason, related to a year-old traffic stop; followed shortly thereafter by a hyper-critical review of, and feigned outrage about, the very next arrest Mr. Johnston made, Marquette County Prosecutor Matthew Wiese issued a Brady/Giglio letter for Mr. Johnston, dated August 30, 2021. Mr. Johnston was maliciously targeted, and treated vastly different from, the more senior officer that fully participated in the arrest and writing of the related report, who had made just as many, if not more, errors, than Mr. Johnston, yet received no discipline whatsoever. The Brady/Giglio law effectively ended Mr. Johnston's law enforcement career, and the City's malicious effort to falsely claim Mr. Johnston was still on probation, all in violation of USERRA, robbed Mr. Johnston of any due process, that he had both earned and deserved. Mr. Johnston went from having nothing derogatory in his personnel file, with arguably the most promising law enforcement career of any police officer in Marquette County (explained below), to being unemployed, humiliated and broke, all in less than three weeks, from the defendants' falsely concluding he had volunteered for extended Army training.

17.    While the preponderance of the evidence will show that the City of Negaunee knew of their USERRA violations from the beginning (late August 2021), in May 2022, following an approximately eight-month federal investigation by the Department of Labor,

Veterans Employment and Training Service ("DOL-VETS"), DOL-VETS told the defendants, in no uncertain terms, both orally and in writing, that the defendants were in violation of USERRA (explained below).  The defendants ignored the DOL-VETS findings and recommendations that they were told would have brought them back into compliance with USERRA, which included rehiring Mr. Johnston as a non-probationary employee, paying him full back pay and affording him union protection.

18.    Union protection for law enforcement officers is undoubtedly a benefit, and in this instance, it would have provided for binding arbitration, which affords both the officer and his employer the opportunity to have disputes resolved by an impartial arbitrator. The arbitrator is trained and experienced in the area of law enforcement policies and practices, disciplinary matters, and what constitutes typical, fair and equal treatment of officers.  Having being maliciously and unfairly deprived of union protection has resulted in unfair and unnecessary financial hardship to Mr. Johnston, as he had to wait for a federal investigation, and he had to hire legal representation.

19.    Mr. Johnston is requesting a jury trial to decide the USERRA matters, and he seeks compensatory and liquidated damages.  The damages include: double his lost wages and benefits, plus interest, due to willful violations of USERRA (ongoing accumulation); and future employment lost wages and benefits (no longer obtainable, due to the actions of the defendants).  At the conclusion of trial, if the Marquette County Prosecutor's Office does not reverse its position before then, Mr. Johnston anticipates asking the Court to make a ruling on the Giglio/Brady issue, which is a related the USERRA issue.

**BACKGROUND INFORMATION**

20.    In November 2014, while still in high school, Mr. Johnston joined the U.S. Army Reserves. Mr. Johnston has continued to serve in the U.S. Army Reserves since that time, and currently holds the rank of First Lieutenant. Mr. Johnston graduated from college with a Master's Degree and a 4.0 GPA; he has received 27 academic and military awards and graduated from the Reserve Officer Training Corps (ROTC) as a Distinguished Military Graduate, which is awarded to the top 25% of all ROTC graduates nationwide. Mr. Johnston has never been in any trouble, at work or otherwise, and had never been disciplined by any employer. Mr. Johnston had an outstanding reputation, and his character and honesty have never before been called into question.

21.    On March 16, 2020, Mr. Johnston began full-time employment as a patrol officer for the City of Negaunee Police Department ("NPD"). As he openly shared with NPD, Mr. Johnston intended to work in local law enforcement for 2-3 years, while finishing his Master's degree, and then to seek employment in federal law enforcement.

22.    When Mr. Johnston was hired by NPD, Mr. Johnston knew of a lengthy U.S. Army Reserve training requirement, which ended up being 141 days, but did not tell NPD about that future training for two reasons. First, Mr. Johnston was hopeful, and had reason to believe, that he could put that training off until while transitioning to federal law enforcement. Mr. Johnston's U.S. Army superiors and colleagues informally suggested to Mr. Johnston that the training could likely be put off for 2-3 years, because the COVID outbreak had delayed such training, and a U.S. Army requirement that the training be completed within 3 years of commissioning as an officer. The second reason Mr. Johnston did not share his knowledge of the future training with NPD was because it would be illegal for NPD to consider the training obligation in the hiring process anyway. When Mr. Johnston was later unexpectedly ordered

7

to attend the training, he notified NPD immediately. Mr. Johnston made timely notifications of all other U.S. Army Reserve training requirements and provided copies of his drill schedules to the NPD road patrol sergeant in a proactive and timely manner.

23.     While almost all of the actions taken against Mr. Johnston by the defendants were directly or indirectly in violation of Mr. Johnston's USERRA rights, the glaring conduct by the defendants that demonstrates their "knowingly or recklessly disregarding the law" relates to the above referenced ignoring of the findings and recommendations of the DOL-VETS investigation; NPD's providing what any law enforcement administrator would know, or should have known, to be false information with regard to the calculation of Mr. Johnston's military related absences, which was used to falsely claim Mr. Johnston was still on probation (next section); and the unequal, excessive and unfair discipline Mr. Johnston received, especially when compared to a more senior officer who was fully involved in every aspect of the incident and report writing that resulted in Mr. Johnston's termination (summarized below). That other officer received no discipline whatsoever. These actions are not only independent violations of USERRA, but are so alarming, they should be considered in the evaluation of all of the other actions taken by Mr. Grahovic and the defendants.

24.     While the DOL-VETS investigators are not judges, they are certainly subject matter experts, and the lead investigator in the DOL-VETS investigation related to Mr. Johnston's complaint was the State Assistant Director for DOL-VETS. In May 2022, following an approximately eight month federal investigation, DOL-VETS told the defendants, in no uncertain terms, both orally and in writing, that they were in violation of USERRA.

25.     The City Attorney of the City of Negaunee had met with several members of the DOL-VETS the previous week to discuss Mr. Johnston's complaint against NPD.  City manager Mr. Heffron was told the DOL-VETS (eight month) investigation had led investigators to determine that, "1) Mr. Johnston was not a probationary employee at the time of his termination, and 2) that Mr. Johnston was suspended, and ultimately terminated, due to his military service.   "Also, during the meeting, the investigators referenced a lack of an official policy to extend Mr. Johnston's probationary term beyond one (1) year due to Mr. Johnston (sic) military service as supportive of their conclusions. DOL-VETS documents reveal that there were 5 DOL-VETS representatives on the Microsoft Teams meeting with the City Attorney, all of whom were introduced, to include the Deputy Regional Administrator of VETS, as well as the State Director and State Assistant Director of VETS.

26.     Again, as to the City's conduct being knowingly and recklessly in disregard of the law, as it relates to double damages: On May 23, 2022 (over eight months ago), DOL-VETS Investigator/State Assistant Director Shawn Johnston sent the Negaunee City Attorney a letter, embedded below, that in no uncertain terms advised the City that the DOL-VETS investigation had concluded that the defendant was in violation of USERRA; and that to be brought back into compliance with USERRA, the defendants would need to rehire Mr. Johnston, as a non-probationary employee, pay him full back pay, and afford him union protection. The below embedded letter, identified below as Images 1 and 2, to the City, advises them that, in relevant part, *"The Veterans' Employment and Training Services (VETS) has completed its investigation of the above-referenced complaint filed against the City of Negaunee by Adam Johnston under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38.U.S.C. 4301-4335. As a result of that investigation, we have*

9

*determined that the evidence supports Adam Johnston's allegations enumerated below. Adam Johnston's allegations were that his probationary period was extended due to his military absences and was therefore not given all resources available upon his termination. Based on the facts, as determined by our investigation, and the application of the law to the facts, it is VETS' position that Adam  Johnston's allegations are meritorious. Specifically, we find that the City of Negaunee is not in compliance with 38 U.S.C. 4313(a)/20 C.F.R. Accordingly, we believe Adam  Johnston is entitled to the following relief afforded under USERRA: Reinstate Mr. Johnston as non-probationary employee with all lost back wages, so he could avail himself to the resources needed in regard to his termination. Granting this relief would bring City of Negaunee into compliance with USERRA."*

**Image 1 (DOL-VETS letter to the City, page 1 or 2, May 23, 2022**

**U.S. Department of Labor**   Veterans' Employment and Training Service
421 East Dunklin Street, P. O. Box 59
Jefferson City, MO 65102-0059
Phone: (573)-751-3921, Fax: (573)-751-6710



May 23, 2022

**_Sent via Email Return Receipt_**

City of Negaunee
Attn: Jeremy Pickens, City Counsel
122 West Spring St.
Marquette, MI 49855

**Re: Adam J. Johnston vs. City of Negaunee**
**Case #: MI-2021-00016-20-R**

Dear Mr. Jeremy Pickens;

The Veterans' Employment and Training Service (VETS) has completed its investigation of the above- referenced complaint filed against City of Negaunee by Adam Johnston under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §§ 4301-4335. As a result of the investigation, we have determined that the evidence supports Adam Johnston's allegations enumerated below.

Adam Johnston's allegations were that his probationary period was extended due to his military absences and was therefore not given all the resources available upon his termination. The City of Negaunee's position with respect to the allegations is that they do not believe they have violated USERRA given the information they have.

Based on the facts, as determined in our investigation, and the application of the law to the facts, it is VETS' position that Adam Johnston's allegations are meritorious. Specifically, we find that City of Negaunee is not in compliance with 38 U.S.C 4313 (a)/20 C.F.R Accordingly, we believe Adam Johnston is entitled to the following relief afforded under USERRA: Reinstate Mr. Johnston as non-probationary employee with all lost back wages, so he could avail himself to the resources needed in regard to his termination. Granting this relief would bring City of Negaunee into compliance with USERRA.

We have unfortunately been unable to reach a satisfactory resolution to this matter and have advised Adam Johnston of our findings. The claimant has been further advised that he may request the case be referred to the U.S. Attorney General for further review and possible representation. If the Attorney General is reasonably satisfied that Adam Johnston is entitled to the relief sought, the Justice Department may seek enforcement on the claimant's behalf, by initiating legal proceedings in U.S. district court. We have also advised Adam Johnston that he

**Image 2 (DOL-VETS letter to the City, page 2 of 2, May 23, 2022)**

In the meantime, if VETS may assist in resolving this issue amicably between the City of Negaunee and Adam Johnston, we would be pleased to continue to work with you, subject to Adam Johnston's approval to reopen the case. Please be aware, however, that we have closed this case without resolution, and Adam Johnston may elect to continue to pursue relief through referral to the Attorney General or with private counsel.

Please contact me as soon as possible at (573) 340-1027, johnson.shawn@dol.gov if you wish to resume attempts to resolve this complaint.

Sincerely,

*Shawn C. Johnson*

Shawn C. Johnson
Investigator/ State Assistant Director

cc: Adam Johnston

## PROBATION ISSUE (USERRA VIOLATION)

27.    When the defendants suspended Mr. Johnston, on August 30, 2021, the defendants falsely and maliciously claimed Mr. Johnston was still on probation, and therefore an "at-will" employee that was not entitled to union representation, or any other form of due process. Despite having been employed by NPD for approximately 17 ½ months, NPD used Mr. Johnston's military related absences in their claim that Mr. Johnston had not fulfilled his one-year probationary period. As detailed below, NPD Chief Ketola provided what he knew, or should have known, to be false and misleading information to the City of Negaunee about how much time Mr. Johnston had been gone from NPD for military training. The defendant used that information in deciding how to treat Mr. Johnston; and after the initiation of the federal investigation, Mr. Ketola knew, or should have known, that the false information would be shared by the defendant City to DOL-VETS investigators.

12

28.    As noted in the below embedded image, identified as Image 3, which is a November 23, 2021 posting for Mr. Johnston's NPD replacement, NPD officers must complete a one-year probation period. When interviewed by DOJ-VETS, every NPD officer who was asked about how long the NPD probation period was replied one-year. Based on a 40-hour work week and 52 weeks in a year, the well accepted standard of work hours in the United States, to include within the law enforcement realm, for 1 year, is 2080 hours (40 x 52 = 2080).

**Image 3 (MCOLES NPD job posting, listing 1-year probationary period)**



MCOLES Home    Contact MCOLES    MI.gov

**MCOLES**
Michigan Commission on Law Enforcement Standards

MCOLES / ONLINE SERVICES / MICHIGAN LAW ENFORCEMENT JOB OPPORTUNITIES / VIEW LAW ENFORCEMENT JOB POSTINGS

**Negaunee City Police Department**
**Full-Time Police Officer**
**Opening Date: 11/23/2021**
**Closing Date: Until Filled**

**Contact Person:** Chief Pat Ketola
**Telephone:** 906-475-4154
**Email:** pketola@cityofnegaunee.com
**Website Link:** www.cityofnegaunee.com

**Position Description Information:**

The City of Negaunee is seeking qualified applicants for a Full-Time Police Officer position. The City of Negaunee is centrally located in Marquette County of the Upper Peninsula. The Negaunee City Police Department provides services to approximately 4,500 residents over approximately 14 square miles.

- Applicants must be MCOLES licensed or licensable.
- Applicants will be selected by an oral board and should be prepared to undergo a comprehensive background investigation, physical and psychological examination.
- The selected applicant must meet all MCOLES requirements, complete a Field Training Program and a one-year probationary period.

13

29.     Mr. Johnston was never told his probation was being extended.  Mr. Ketola claimed in a memorandum that Mr. Johnston was told that his probation was being extended by NPD supervisory staff, but does not identify that person. There are only three supervisors at NPD, so if it was not him, it had to have been Mr. Grahovic or Road Patrol Sergeant Todd Racine ("Racine"). There was nothing in Mr. Johnston's personnel file that made any reference to Mr. Johnston's probation being extended because of his military absences, or any other reason. Mr. Johnston never had any disciplinary issues, so the only reason NPD would have to extend his probation would be his military absences. NPD does not have a policy that addresses how military related absences will be treated.

30.     Because NPD falsely claimed he was still on probation, Mr. Johnston was deemed an "at-will" employee, which denied him union protection or any other form of due process. The Negaunee City Manager sent Mr. Johnston a letter, dated October 18, 2021, indicating that Mr. Johnston's "Probationary Employment" was being officially terminated.

31.     As explained below, Mr. Johnston agrees with the DOL-VETS investigation and findings, cited above, that the City was in violation of USERRA for claiming Mr. Johnston was a probationary employee, even if one assumed for the sake of argument that Mr. Johnston had not worked a full one-year worth of hours (2080 hours). As noted below, however, Mr. Johnston did work well in excess of 2080 hours before he was suspended, as even the misleading documents provided by the defendant clearly indicate.

32.     As noted in the below embedded image, identified as Image 4, obtained by Mr. Johnston from the City pursuant to a FOIA request, and contrary to the original documents provided by Mr. Ketola (Image 6 below), Mr. Johnston worked a total of 2,210 regular hours and 99 hours of overtime ($2,855.95 in overtime pay divided by his $28.83

14

overtime rate), for a total of 2309 actual hours worked, before he was suspended, on August 30, 2021. This is 229 hours (almost 6 weeks) more than the standard 2080-hour work year. When suspended, Mr. Johnston still had over 100 hours of annual leave and personal leave that he could have taken if Mr. Johnston knew the defendants were going to penalize him for his military service. By all accounts, annual or personal leave taken during their time at NPD is not, and cannot, be used to extend an officer's probation period. Also of note, in Image 4, Mr. Johnston paid $619.50 in union dues during his employment at NPD.

**Image 4 (Earnings Report/Union Dues paid by Mr. Johnston)**

### Earnings with Deductions Report
#### Adam Johnston Union Dues

CITY OF NEGAUNEE
From:   01/01/2020
To:     12/31/2021

Date: 11/28/2022
Time: 10:14:08

| Employee ID | Empl.Type | Pay Date | Hourly Rate | Reg Pay | Reg Hours | OT Pay | Ded Code | Ded Amt |
|---|---|---|---|---|---|---|---|---|
| 00129 | FT | 04/03/2020 | 19.2200 | $1,579.80 | 82.1956 | $0.00 | | $0.00 |
| 00129 | FT | 04/17/2020 | 19.2200 | $1,581.90 | 82.3049 | $115.32 | NPPA | $44.25 |
| 00129 | FT | 05/01/2020 | 19.2200 | $1,581.90 | 82.3049 | $0.00 | | $0.00 |
| 00129 | FT | 05/15/2020 | 19.2200 | $1,581.90 | 82.3049 | $0.00 | NPPA | $44.25 |
| 00129 | FT | 05/29/2020 | 19.2200 | $1,581.90 | 82.3049 | $28.83 | | $0.00 |
| 00129 | FT | 06/12/2020 | 19.2200 | $1,581.90 | 82.3049 | $230.64 | | $0.00 |
| 00129 | FT | 06/26/2020 | 19.2200 | $1,581.90 | 82.3049 | $72.60 | NPPA | $44.25 |
| 00129 | FT | 07/10/2020 | 19.2200 | $1,581.90 | 82.3049 | $0.00 | | $0.00 |
| 00129 | FT | 07/24/2020 | 19.2200 | $1,581.90 | 82.3049 | $0.00 | NPPA | $44.25 |
| 00129 | FT | 08/07/2020 | 19.2200 | $1,581.90 | 82.3049 | $0.00 | | $0.00 |
| 00129 | FT | 08/21/2020 | 19.2200 | $1,581.90 | 82.3049 | $0.00 | NPPA | $44.25 |
| 00129 | FT | 09/04/2020 | 19.2200 | $1,581.90 | 82.3049 | $118.32 | | $0.00 |
| 00129 | FT | 09/18/2020 | 19.2200 | $1,581.90 | 82.3049 | $275.46 | NPPA | $44.25 |
| 00129 | FT | 09/30/2020 | 19.2200 | $1,000.00 | 52.0291 | $0.00 | | $0.00 |
| 00129 | FT | 10/02/2020 | 19.2200 | $1,663.50 | 86.5505 | $122.52 | | $0.00 |
| 00129 | FT | 10/16/2020 | 19.2200 | $251.84 | 13.1030 | $0.00 | NPPA | $44.25 |
| 00129 | FT | 11/13/2020 | 19.2200 | $0.00 | 0.0000 | $0.00 | | $0.00 |
| 00129 | FT | 12/11/2020 | 19.2200 | $0.00 | 0.0000 | $0.00 | | $0.00 |
| 00129 | FT | 01/08/2021 | 19.2200 | $0.00 | 0.0000 | $0.00 | | $0.00 |
| 00129 | FT | 02/05/2021 | 19.2200 | $0.00 | 0.0000 | $0.00 | | $0.00 |
| 00129 | FT | 03/05/2021 | 19.2200 | $0.00 | 0.0000 | $0.00 | | $0.00 |
| 00129 | FT | 03/19/2021 | 19.2200 | $1,710.70 | 89.0062 | $0.00 | NPPA | $44.25 |
| 00129 | FT | 04/01/2021 | 19.2200 | $1,808.30 | 94.0843 | $0.00 | | $0.00 |
| 00129 | FT | 04/16/2021 | 19.2200 | $1,808.30 | 94.0843 | $695.63 | NPPA | $44.25 |
| 00129 | FT | 04/30/2021 | 19.2200 | $1,809.50 | 94.1467 | $267.60 | | $0.00 |
| 00129 | FT | 05/14/2021 | 19.2200 | $1,809.30 | 94.1363 | $0.00 | | $0.00 |
| 00129 | FT | 05/28/2021 | 19.2200 | $1,808.30 | 94.0843 | $0.00 | NPPA | $44.25 |
| 00129 | FT | 06/11/2021 | 19.2200 | $1,808.30 | 94.0843 | $66.15 | | $0.00 |
| 00129 | FT | 06/25/2021 | 19.2200 | $927.55 | 48.2596 | $102.38 | NPPA | $44.25 |
| 00129 | FT | 07/09/2021 | 19.2200 | $815.40 | 42.4246 | $318.50 | | $0.00 |
| 00129 | FT | 07/23/2021 | 19.2200 | $1,808.30 | 94.0843 | $407.57 | NPPA | $44.25 |
| 00129 | FT | 08/06/2021 | 19.2200 | $0.00 | 0.0000 | $0.00 | | $0.00 |
| 00129 | FT | 08/20/2021 | 19.2200 | $1,085.60 | 56.4828 | $0.00 | NPPA | $44.25 |
| 00129 | FT | 09/03/2021 | 19.2200 | $1,808.30 | 94.0843 | $34.13 | | $0.00 |
| 00129 | FT | 09/17/2021 | 19.2200 | $1,587.60 | 82.6015 | $0.00 | NPPA | $44.25 |
| 00129 | FT | | Employee Total: | $44,073.39 | 2,293.1004 | | | $619.50 |

15

33.     The defendants overstated the total number of days Mr. Johnston was gone for military training by 21 days, falsely claiming Mr. Johnston was gone a total of 183 days, leaving him 16 days short of one-year. Refusing to count hours worked, and trying to count regular days off as military absences, were obvious efforts to provide false and misleading information.

34.     To demonstrate the targeting and malicious nature of how Mr. Johnston was treated by the City, to illustrate the self-righteous and unfair nature of the allegations against Mr. Johnston, to illustrate how false and/or mistaken information was provided to the Marquette County Prosecutor's Office (MCPO), to illustrate the City's apparent general confusion over the facts when Mr. Johnston was suspended, as well as Mr. Ketola's own inability to accurately document and convey information, on August 31, 2021 (the day after Mr. Johnston was suspended, and the same day the MCPO issued Mr. Johnston's Brady/Giglio letter), Mr. Ketola sent the below embedded email, identified as Image 5, to the MCPO Chief Assistant Prosecutor, initials A.G., in which Mr. Ketola falsely advises the MCPO that Mr. Johnston was gone for the military training from July 26, 2020 to March 30, 2021 (over eight months).

**Image 5 (Mr. Ketola's August 31, 2021 email to the Marquette County Prosecutor's Office)**

Pat Ketola <pketola@cityofnegaunee.com>                              Tue, Aug 31, 2021 at 10:35 AM
To: Andy Griffin <agriffin@mqtco.org>

Mr. Griffin,

Attached is the requested list of incidents involving Adam Johnston with a PENDING COURT/PROSECUTOR status.

Many of the incidents are older and we have not received a disposition from the court yet. There is a large gap from 7/26/2020 to 3/30/2021 as Johnston was out of state for mandated military training.

16

35.    When examining the relevant paystubs, embedded below as Images 6, 7 and 8, as well as the NPD schedule for August 2021, embedded below as Image 9, all of which would have been readily available to Mr. Ketola, Mr. Grahovic, and Mr. Racine,  Mr. Ketola falsely inflated Mr. Johnston's military absences. Mr. Ketola claimed Mr. Johnston was gone 33 days for military training, during the 2 ½ months before he was suspended. In reality, Mr. Johnston only missed 12 work days during that period (a 21 day "error"). Counting the entire duration Mr. Johnston was gone for his extended 141-day Army training is at best debatable. During this period, immediately prior to his suspension, while apparently trying to keep Mr. Johnston under the one-year mark, Mr. Ketola, or whomever had given him the information he used in his memorandum, chose to count Mr. Johnston's regular days off before and after his military service, and then some. Mr. Ketola also ignored the fairest and most logical calculation of whether Mr. Johnston had worked one-year (hours worked) as described above, especially when considering how Mr. Johnston had adjusted his work schedule to lessen the burden his military absences would cause the department.

36.    The relevant pay stub for the period of August 04, 2021 through August 11, 2021, embedded below as Image 9, reveals that Mr. Johnston worked 48 hours that pay period, so Mr. Johnston missed less than 3 work days (12-hour shifts), not the 7 days that Mr. Ketola falsely claimed. The NPD work schedule, embedded below as Image 10, clearly shows Mr. Johnston worked 3 of the days that Mr. Ketola said he was off (August 02, 03 and 04, 2021), and only had 3 military related absences (reflected as "MT" for military training on the schedule).

**Image 6 (Paystub covering August 04 through 11, 2021)**

Name: ADAM J JOHNSTON
Dept: Police - City of Negaunee

Check #    226117

ID #: 00129

Pay Date: 08/20/2021
Pay Ending: 08/14/2021

Current Gross:    $1,085.60
Net Pay:    $0.00

| Earnings Code | Hours | Amount | Taxes Code | Amount | YTD Amt | Deductions Code | Amount | YTD Amt |
|---|---|---|---|---|---|---|---|---|
| Regular | 48.0000 | $1,085.60 | US Tax | $64.70 | $2,233.17 | NPPA | $44.25 | $265.50 |
| | | | Medicare | $15.74 | $368.86 | Police Pen | $54.28 | $992.08 |
| | | | Soc Sec | $67.31 | $1,577.09 | USAA FSB | $793.18 | $18,153.30 |
| | | | State Tax | $46.14 | $1,047.10 | | | |

**Image 7 (August 2021 NPD Work Schedule)**

18

37.    Comparing Mr. Ketola's letter to the City Attorney summarizing Mr. Johnston's alleged military absences, for the period of June 09 through June 18, 2021 with the below embedded paystub, identified as Image 8, Mr. Johnston worked 44 hours that pay period, so when considering the days Mr. Johnston would have been scheduled to work, absent his military service, Mr. Johnston missed 3 work days (12-hour shifts), not the 9 days that Mr. Ketola falsely claimed.

**Image 8 (Paystub covering June 09 through June 18, 2021)**

| Name: ADAM J JOHNSTON | | | | | Check # | 225787 | |
|---|---|---|---|---|---|---|---|
| Dept: Police - City of Negaunee | | | | | | | |
| | | | Pay Date: 06/25/2021 | | Current Gross: | $1,029.93 | |
| ID #: 00129 | | | Pay Ending: 06/19/2021 | | Net Pay: | $0.00 | |
| Earnings | | | Taxes | | Deductions | | |
| Code | Hours | Amount | Code | Amount | YTD Amt | Code | Amount | YTD Amt |
| Regular | 41.0000 | $927.55 | US Tax | $58.01 | $1,619.69 | NPPA | $44.25 | $177.00 |
| 1.5X | 3.0000 | $102.38 | Medicare | $14.93 | $271.97 | Police Pen | $46.38 | $749.28 |
| | | | Soc Sec | $63.86 | $1,162.81 | USAA FSB | $758.73 | $13,402.77 |
| | | | State Tax | $43.77 | $771.61 | | | |

38.    Yet again, for the period of July 16, 2021 through August 02, 2021, Mr. Ketola claimed Mr. Johnston missed 17 days for military training, which was Mr. Johnston's two-week Annual Training. As noted in the below embedded paystub, identified as Image 9, Mr. Johnston worked 12 hours of overtime the proceeding pay period, to reduce the amount of time he would be gone for the military. When considering the days Mr. Johnston would have been scheduled to work absent his military service, Mr. Johnston missed 6 work days (12-hour shifts), not the 17 days Mr. Ketola falsely claimed.

19

**Image 9 (Paystub for the pay period ending July 17, 2021)**

| Name: ADAM J JOHNSTON Dept: Police - City of Negaunee | | | | | | Check # | | 225956 |
|---|---|---|---|---|---|---|---|---|
| ID #: 00129 | | | Pay Date: 07/23/2021 Pay Ending: 07/17/2021 | | | Current Gross: Net Pay: | | $2,392.27 $0.00 |
| Earnings | | | Taxes | | | Deductions | | |
| Code | Hours | Amount | Code | Amount | YTD Amt | Code | Amount | YTD Amt |
| Regular | 80.0000 | $1,808.30 | US Tax | $256.59 | $2,168.47 | NPPA | $44.25 | $221.25 |
| Hol Off | 8.0000 | $176.40 | Medicare | $34.69 | $345.14 | Police Pen | $99.24 | $937.80 |
| 1.5X | 12.0000 | $407.57 | Soc Sec | $148.32 | $1,475.68 | USAA FSB | $1,707.51 | $16,971.33 |
| | | | State Tax | $101.67 | $981.83 | | | |

39.     In early August 2021, approximately three weeks before he was suspended, Mr. Johnston was in the final month of his Master's degree program, had been employed at NPD for almost 17 months, had absolutely nothing derogatory in his NPD personnel file, and had no reason to believe he had not been off probation for almost five months. Nobody told Mr. Johnston his probation was being extended because of his military absences, and there was nothing to that effect in his personnel file. Mr. Johnston had an unusually high number of military related training obligations over the preceding two months, in June, July and early August 2021, which required Mr. Johnston to miss 12 work days (not the 33 days Mr. Ketola had claimed, as noted above). Those obligations included a Drill weekend in June, and then almost back-to-back obligations, in late July and early August, for his two-week Annual Training at Ft. McCoy, Wisconsin, and then an atypical Military Intelligence Leadership Conference, in Boston, Massachusetts.

40.     Those military absences logically presented scheduling hardships, and likely resulted in other NPD officers having to delay or cancel prime summertime annual leave time-off. Through no fault of Mr. Johnston, his unusual and unfortunately timed military obligations were causing a burden on the small department. Additionally, during the U.S.

military withdrawl of forces from Afghanistan, on August 26, 2021, 13 U.S. Marines and 170 civilians were killed in a bombing at a Kabul, Afghanistan airport. This incident prompted NPD (Initials Officer J.B.) to ask Mr. Johnston if he thought he might be mobilized to active duty. The conversation was within earshot of Mr. Grahovic, and was apparently at least some concern within the department.

41.    In late July or early August 2021, on a date that Mr. Johnston cannot identify and Mr. Grahovic does not identify in his memorandum, Mr. Johnston reported for work after his two-week annual reserve training. Mr. Johnston stopped by Mr. Grahovic's office to say hello (Mr. Grahovic and Mr. Johnston were the only ones present). Mr. Grahovic casually mentioned that while Mr. Johnston was off for the military, a citizen, (initials "J.G."), had made a complaint about a traffic stop Mr. Johnston had made approximately one-year earlier. During a brief, light-hearted and informal exchange, which Mr. Johnston estimates to have lasted less than two minutes, Mr. Grahovic explained that J.G. was not contesting the failure to use a turn signal ticket Mr. Johnston had issued him, but rather had complained that he had since seen the unknown officer (Mr. Johnston) not use his turn signal or wear his seatbelt.

42.    Based on how Mr. Grahovic was appearing to make light of the nature and timing of the complaint, and how Mr. Grahovic had routinely scoffed at and made light of such minor citizen complaints in the past, Mr. Johnston believed Mr. Grahovic was simply telling Mr. Johnston that all officers need to be aware that citizens are always watching, to include those that might be angry about a ticket they had received; so all officers need to make sure they adhere to all traffic laws, at all times (which Mr. Johnston had always tried to do anyway). Mr. Grahovic's memorandum about the year-old traffic stop, partially

embedded below, supports Mr. Johnston's view of Mr. Grahovic's intention during this initial conversation, and Mr. Grahovic indicated that he planned to share that concept/lesson with all NPD officers.

43.     Mr. Johnston did not at all consider himself in trouble, nor did Mr. Johnston feel like he needed to explain the situation. The man was not disputing the ticket, and his complaint about an officer not using his turn signal or wearing his seatbelt, a year later, was not at all concerning for two reasons: First, as Mr. Johnston was sure Mr. Grahovic would agree, the nature of police work sometimes requires officers to remove their seatbelt, and sometimes officers have to turn quickly and do not have time to use their turn signal. Secondly, Mr. Johnston had driven with Mr. Grahovic on several occasions and knew Mr. Grahovic was not a stickler in his own adherence to minor traffic laws. Mr. Grahovic had previously told Mr. Johnston and NPD Officer initials M.G. that he had shot a deer from inside his patrol car in the past.

44.     Throughout this initial conversation, Mr. Johnston made it extremely clear to Mr. Grahovic that he did not at all recall the traffic stop or know who J.G. was. Mr. Johnston had made, on average, approximately 4 to 6 traffic stops each shift, so Mr. Johnston conservatively estimates that he had made 150 to 200 traffic stops since the one involving J.G., in addition to having hundreds of other citizen contacts. Like any other police officer, Mr. Johnston had a vast majority of positive contacts with the public, but had also experienced dozens of contacts with citizens, many of whom were intoxicated and/or in an agitated state of mind when the police arrived, who had engaged in disrespectful and/or threatening behavior over the preceding year. Towards the end of the brief conversation, after pointing out that he makes a lot of traffic stops, but does not write a lot of tickets

22

(something Mr. Grahovic would already know), Mr. Johnston stated something to the effect of, if he had written such a mundane ticket, the man must have been very disrespectful and/or threatening. Mr. Johnston then made an off-the-cuff remark, to the effect of, 'the man must have said something like he was going to beat my ass if I wasn't in uniform, or something like that, for me to write him a failure to use a turn signal ticket.' It was very clear that Mr. Johnston was not saying the man had in fact said that (again he had already made it very clear he did not recall the year-old random traffic stop of a stranger, or who they were talking about), but rather Mr. Johnston was clearly and light-heartedly just being sarcastic.  At the time, Mr. Johnston could picture in his mind several hostile male citizens he had interacted with over the preceding year, but he had no reason to know who J.G. was.

45.    As noted below, Mr. Grahovic would later mischaracterize Mr. Johnston's statement and maliciously accuse him of lying about the traffic stop. Mr. Grahovic has acknowledged that Mr. Johnston had no reason to lie, and there is no logical reason why Mr. Johnston would lie about the man threatening him, especially considering that Mr. Johnston knew the traffic stop body camera footage would be readily available for review. Mr. Johnston even suggested to Mr. Grahovic that he review that video, to which Mr. Grahovic replied there was no need.

46.    Because timing is significant in understanding this matter, and to keep the summary of events in chronological order: approximately one week later, with Mr. Johnston not having heard anything else about the matter, despite having seen Mr. Grahovic on several occasions, on August 04, 2021, Mr. Johnston's father (initials J.J.), who was at the time an FBI Agent in the area (recently retired and only mentioned only to put the conversation into context), had a very brief, friendly and introductory conversation

23

with Mr. Racine, who was acting as a court security officer, at the federal courthouse. That conversation got interrupted when the federal judge came back into the courtroom, right after Mr. Johnston's father told Mr. Racine that it was his fault that Mr. Johnston had been gone so much for the military. What Mr. Johnston's father meant and was going to say, if not interrupted, was that he had encouraged Mr. Johnston to go into military intelligence, which required Mr. Johnston to drill seven hours away from Negaunee (near Detroit, Michigan). In hindsight, Mr. Racine likely interpreted the interrupted conversation he had with Mr. Johnston's father as Mr. Johnston's father having encouraged Mr. Johnston to volunteer for additional Army training.

47.     Following the courtroom conversation, Mr. Johnston's next work day was from 7:00 p.m., on August 09, 2021, to 7:00 a.m., on August 10, 2021, because he had switched shifts with another officer. At the end of Mr. Johnston's shift, Mr. Grahovic, in front of Mr. Racine, told Mr. Johnston that he had reviewed the J.G. traffic stop body camera footage, and accused Mr. Johnston of having lied to him during their initial conversation about the matter. Mr. Johnston tried to defend himself, deny that he had lied, and clarify for both Mr. Grahovic and Mr. Racine that Mr. Grahovic was mischaracterizing what Mr. Johnston had said during the initial conversation. Mr. Grahovic told Mr. Johnston to, "shut the fuck up," to stop talking and to go home. Mr. Grahovic then used Mr. Johnston's passionate, but respectful denial of wrongdoing, which is what any innocent law enforcement officer, military officer, or any other man of honor, would do if falsely accused of lying (fighting words), to try and get Mr. Johnston disciplined for being "defensive and argumentative." Mr. Grahovic was very angry at Mr. Johnston at the conclusion of this meeting, for having challenged him in front of Mr. Racine, and Mr. Johnston believes Mr.

24

Grahovic's future actions were made even more spiteful due to this increased anger at Mr. Johnston.

48.     When Mr. Johnston was later suspended, on August 30, 2021, Mr. Ketola and Mr. Grahovic told Mr. Johnston that they do not think he lied, but rather that he has problems accurately relaying information. In his August 31, 2021 Brady/Giglio letter, partially embedded below, identified as Image 10, Marquette County Prosecutor Matthew Wiese, wrote that it had come to his attention that Mr. Johnston had been, "dishonest with a superior officer in relaying the events in a traffic matter," but fails to identify who brought the matter to the MCPO attention. The MCPO's reference to the slanderous and libelous claim that Mr. Johnston had lied about the year-old traffic stop establishes that it was factored into their career-ending Brady/Giglio finding.

49.     Mr. Johnston understands that based on the maliciously false and misleading information provided by the City, the MCPO had little choice but to issue a Brady/Giglio finding. It is unfortunate, however, that the MCPO does not have a policy that affords formal due process rights for accused officers; and the MCPO ignored Mr. Johnston's repeated offer to take a polygraph examination as regards the matter as well as Mr. Johnston's request that the MCPO facilitate and coordinate an independent investigation into the matter by another local law enforcement agency.

**Image 10 (partial Marquette County Prosecutor Brady/Giglio Letter, August 31, 2021)**

August 31, 2021

Pat Ketola, Chief of Police
Negaunee City Police Department
319 West Case Street
Negaunee, MI 49866

Dear Chief Ketola:

The methamphetamine case involving People v Almy Moore (Incident No. 21-000978-609) was required to be dismissed by my office due to the discrepancies of what was written in the police report as compared to the events that were recorded on the body worn video camera of Officer Adam Johnston. In the course of investigating this discrepancy it has also come to my attention that, on a different matter, Officer Johnston was dishonest to a superior officer in relaying events of a traffic matter.

50.     As explained below, this false and malicious claim by Mr. Grahovic that Mr. Johnston had lied was a targeted and retaliatory pretext against Mr. Johnston. The claim has played a significant role in Mr. Johnston's undeserved Brady/Giglio finding and ultimate termination. Mr. Grahovic's false and malicious representation, both verbally and in writing, that Mr. Johnston had lied about the traffic stop, has caused irreversible damage to Mr. Johnston's reputation; has caused Mr. Johnston severe emotional distress; has presented Mr. Johnston in a false light; and has resulted in Mr. Johnston receiving unwarranted criticism, dishonor and condemnation. This malicious and calculated defamation, along with Mr. Grahovic's apparent anger at Mr. Johnston, played a significant part in how the next targeting of Mr. Johnston (next section), by Mr. Grahovic, occurred on August 18, 2021. This was just eight days after Mr. Grahovic first accused Mr. Johnston of lying about a non-issue, and just two days after Mr. Grahovic had dated his two-page libelous memorandum to Mr. Ketola.

26

51.     As relevant below, Mr. Grahovic dated his two-page memorandum about the alleged traffic stop lie on August 16, 2022, six days after the alleged lie and approximately three weeks after J.G. had allegedly made his complaint. Mr. Ketola's memorandum to the City Manager about Mr. Johnston indicated that he had received Mr. Grahovic's memorandum on August 24, 2021, but that Mr. Grahovic had verbally briefed him on the matter on August 16, 2021. Mr. Ketola was on the schedule as working on August 10, 2021 (the date of the alleged lie).

52.     The day after Mr. Grahovic falsely accused Mr. Johnston of lying, on August 11, 2021, while at a complete loss as to why Mr. Grahovic would fabricate what Mr. Johnston had said during their brief and innocuous conversation about the year-old traffic stop, Mr. Johnston happened to speak to his father on the telephone, and mentioned Mr. Grahovic's unprecedented hostility towards him. Mr. Johnston's father, fearing the timing (in the middle of Mr. Johnston's unusually large number of military absences, and Mr. Johnston's first day back to work following the August 04, 2021 courtroom conversation with Mr. Racine), strongly suggested that Mr. Racine had misunderstood the interrupted courtroom conversation, and that Mr. Racine had likely shared that misunderstanding with Mr. Grahovic. This caused Mr. Johnston's father to send the below embedded email, identified as Image 11, dated August 12, 2021, to Mr. Racine, copying in Mr. Grahovic and Mr. Ketola. The email substantiates that the courtroom conversation took place, the content of that conversation, as well as the timing of it. To put the initial courtroom conversation and the below subsequent email into context, it should be noted that Mr. Johnston's father was a police officer for eight years, had worked in federal law enforcement in the area for 20 years, and had always enjoyed an outstanding relationship and reputation with local law enforcement.

**Image 11 (Mr. Johnston's father's email to NPD Administrators, dated August 12, 2021)**

From: Johnston, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇>
Sent: Thursday, August 12, 2021, 5:53 AM
To: tracine@cityofnegaunee.com; cgrahovac@cityofnegaunee.com; pkatoa@cityofnegaunee.com
Subject: Fwd: Adam Johnston

Sgt. Racine,

No need to respond. It was nice meeting you in court last week and again thank you for training Adam. Our conversation got interrupted in the middle of my saying that I was sure that Adam's military service has proven to be a burden on the department, that Adam was frustrated also, and that it was my fault. In light of my having expressed to the detective sergeant and the chief (both cc'd) in the past that I hoped for Adam to get as much career building experience/training as possible, I can see where that might be interpreted as my saying that I was in some way causing him to be gone so much for the military, so let me explain.

**On my honor, Adam has not volunteered for one thing, or been gone from Negaunee for one more second than he absolutely had to be and was ordered to be.** He and I understand the burden his military absences have caused the department. It has been extremely exhausting and frustrating for Adam as well, especially while trying to learn to be a police officer.

What I meant by my fault was that while he was in ROTC and near graduation, I pushed him to go into military intelligence, because he had the grades/scores for it and I thought it would complement his law enforcement career. I still think it does, but because a military intelligence officer is a Battalion level position, he has to drill 7 hours from home, which has proven to be a logistical nightmare.

As to his military absences, in addition to the well understood obligations of one weekend a month and two weeks a year, his other absences have been his 5-month military intelligence basic officer leadership course (BOLC) and four days in Boston. As to BOLC, that is a required course that the Army recruiter and his ROTC commanders lead us to believe he would attend shortly after graduation. You have up to three years to go to BOLC, and after the Army delayed him for almost a year, for no reason, Adam tried to delay it to the three-year mark or beyond and sought employment with Negaunee. He hoped he would go with two years under his belt, and perhaps while transitioning to federal law enforcement. Either way, he was at the Army's mercy and he needed to get a job. Four months later, with very short notice, they ordered him to go. Boston was a rare conference that Adam was simply ordered to go to.

Although Adam had been in the Reserves for four years, he and I both underestimated how hard it would be trying to balance the start of both his law enforcement and Army officer careers. Adam wants to do right by Negaunee and he is grateful for the opportunity. He is now done with his master's degree and he expects his future military duties will be more limited, which will hopefully allow him to more fully focus on becoming the best police officer he can be. Thank you for your understanding.

53.    As an additional example of Mr. Grahovic's apparent targeting and unequal treatment of Mr. Johnston, in his August 16, 2021 memorandum to Mr. Ketola, about the year-old traffic stop and the alleged lie, Mr. Grahovic stated that J.G. was, "angry, as he has seen the officer who cited him on numerous occasions driving in town and failing to use his turn signal as well as other moving violations." During a subsequent interview with DOL-VETS Investigator/State Assistant Director Shawn Johnston, conducted on December 13, 2021, Mr. Grahovic amended the above statement to indicate that J.G. had complained that

28

he had seen the unknown officer (who cited him) **and other officers** not using their turn signals or seat belts. As referenced above and explained further below, Mr. Grahovic ended Mr. Johnston's very promising law enforcement career over alleged inconsistent and incomplete information being included in a police report. Mr. Grahovic's failure to mention to Mr. Ketola (the Police Chief), when requesting that Mr. Johnston be disciplined, that J.G. had also complained about the actions of other officers, is significant. It suggests the targeting of Mr. Johnston, an effort to amplify the negative view of, and the potential consequences for Mr. Johnston, and demonstrates unfair and unequal treatment. A citizen complaint against the driving of several NPD officers, rather than against a single NPD officer, completely changes the context of the complaint. Additionally, in his DOL-VETS interview, Mr. Grahovic said of Mr. Johnston, "I think he is a young guy who <u>wants to do a good job</u>," which when combined with the positive statements made by Mr. Johnston's military supervisors and NPD co-workers (some of which are summarized below), is significant in evaluating Mr. Johnston's actions. Portions of Mr. Grahovic's August 16, 2021 memorandum, as well as the summary transcript from his December 13, 2021 DOL–VETS interview, are embedded below, identified as Images 12 and 13, respectively.

**Image 12 (Mr. Grahovic's memorandum about a year-old traffic stop, August 16, 2021)**

Date:    8/16/2021

To:      Chief Patrick Ketola

From:    D/Sgt. Craig Grahovac

Subject: Corrective Measures/Accurate depiction/relay of information- Patrol Officer Adam
         Johnston

---

Chief Ketola,

On August 10, 2021, I spoke with Officer Johnston related to a citizen complaint which had been received approximately 2 weeks prior. This corrective conversation occurred in Sergeant Racine's office, with myself, Sgt. Racine and Officer Johnston present.

This conversation stems from a traffic citation issued by Officer Johnston to John Gooding for failure to use a turn signal. When I spoke with Gooding, he explained the circumstances of his contact with Officer Johnston. Gooding advised he cannot say if he did or did not use his turn signal, and was not contesting the citation. Gooding went onto explain that he was angry, as he has seen the officer who cited him on numerous occasions driving in town and failing to use his turn signal as well as other moving violations.

**Image 13 (Mr. Grahovic's DOL-VETS interview, December 13, 2021)**

(Q)What is your impression of Mr. Johnston? Personal and work?
(A) I think he is a young guy who wants to do a good job and never really wanted to be at the local police level. Always had higher ambitions and always wanted to be out on patrol. He just wanted to do the police stuff and not the paperwork stuff.

(Q) Conversation on August 10, 2021 speak to what lead up to the conversation?
(A) So a person came in couple weeks prior complaining about a traffic ticket and stating that he was cited for failure to use turn signals and use seatbelts and had seen the officer and other officers not using their turn signal or seatbelt. I informed I could not tell him whether he was right or the office was right but would look into it. I talked to Adam and
Adam said he remembered the guy and he was driving a jeep navigator and told me that if I was not wearing a badge he would keep my ass. So I said that is really surprising, does not seem like that type of guy but will let the Chief know but the guy is good with it now. We just we need to set the standard and make sure we buckle up and use turn signals. After talking with the Chief he

54.    Following an August 18, 2021 arrest of a male subject (initials "A.M."), who

was arrested on outstanding arrest warrants, and later lodged in jail on those warrants and

for possession of methamphetamine, which was the first arrest or significant law

enforcement action Mr. Johnston had made after Mr. Grahovic falsely accused him of lying, Mr. Grahovic went out of his way to conduct a very unusual and hyper-critical review of the entire traffic stop and subsequent arrest. Mr. Grahovic then feigned outrage and called the MCPO to condemn Mr. Johnston's actions, to include a false claim that the report was dramatically inconsistent with the body camera video, while at the same time contending that the report was too short and did not contain enough detail. Mr. Grahovic, and later the City of Negaunee, downplayed, if not completely ignored, the full participation, in every aspect of the arrest and subsequent report writing, by a senior NPD officer, who had five more years of experience than Mr. Johnston, who was present and participated in the entire arrest, search and report writing (initials Officer "J.M.").

55.     The following is not meant at all to be a criticism of Officer J.M., but rather to demonstrate the defendants' targeting of Mr. Johnston, as well as the unfair and unequal treatment Mr. Johnston received, in part, if not entirely, due to his military service. Mr. Johnston believes Officer J.M. to be a good, well-intentioned officer, who like Mr. Johnston, was doing the best he could to interpret and apply a variety of legal issues that presented themselves during a drug investigation, which neither officer had a lot of experience in handling. Neither Mr. Johnston or Officer J.M. engaged in any intentional wrong-doing, and neither of them made any mistakes that would typically result in anything more than a verbal counseling, which is what Officer J.M. ultimately received.

56.     While Mr. Johnston does not deny making relatively minor, common, unintentional, understandable and good faith arguable legal errors during the traffic stop, as it relates to a Miranda warning and arguably a search and seizure issue, the arguable mistakes were made alongside, and with the full knowledge, consultation and participation

31

of, Officer J.M.. Officer J.M. opened, helped write and ultimately finished the falsely maligned police report. Again, Officer J.M. had five years more experience than Mr. Johnston, had made the same arguable errors as Mr. Johnston, and arguably more, yet he received absolutely no discipline in the matter. Pursuant to an October 2022 FOIA request, Officer J.M.'s personnel file was obtained from the City. The memorandum summarizing Officer J.M.'s mistakes during the A.M. arrest was not even in the file (14 months after the incident).

57.    Despite Mr. Grahovic's and later Mr. Ketola's malicious mischaracterization of the incident, in reality, there is only one statement in the report, as it relates to whether the drugs were found during an inventory search as opposed to a search incident to arrest, that is at all debatable. As noted in Mr. Ketola's summary of the body camera footage, Mr. Johnston told A.M. before any search was conducted that his vehicle was going to be towed, so an inventory search would be appropriate and required by department policy. The Michigan Vehicle Code, section 257.904(3)(a) provides that the Michigan Secretary of State shall cancel the registration plates of any vehicle operated, or allowed to be operated by a person who's driver's license was suspended, denied or revoked, which A.M.'s license was (NPD policy also mandates that such vehicles are to be impounded). Further, it was the middle of the night, the vehicle had no tail lights and (before any search) A.M. told Mr. Johnston and Officer J.M that the female passenger could not safely drive the vehicle, because it had no tail lights, the power steering did not work, he believed the serpentine belt was broken, and he thought the vehicle was breaking down as they were being stopped. Mr. Ketola acknowledges in his memorandum that an inventory search would be required by NPD policy if the vehicle was going to be towed, which it ultimately was. The

relevant portion of the NPD Vehicle Inventory policy is embedded below, identified as Image 14.

**Image 14 (NPD Vehicle Inventory Policy)**

### NEGAUNEE POLICE DEPARTMENT

| GENERAL ORDER #9 | SUBJECT:  VEHICLE IMPOUNDMENT POLICY | |
|---|---|---|
| DATE OF ISSUE:<br>April 18, 1991 | EFFECTIVE DATE:<br>June 21,2017 | REVISED DATE:<br>June 13, 2017 |
| RESCINDS:  ALL OTHER PREVIOUS WRITTEN ORDERS ON THE VEHICLE IMPOUNDMENT POLICY | PAGE:<br>     Page 2 of 2 | |

**III.     _INVENTORY_**

_Whenever a vehicle is impounded by this Department, a complete inventory of the vehicle will be made of all compartments and containers, open or closed, for the purpose of noting and securing valuable materials._

58.     Throughout the incident, Mr. Johnston had every intention of impounding the vehicle. As noted in Mr. Ketola's summary, again before any search was conducted, Officer J.M. told Mr. Johnston that they should allow the female to take the vehicle, if possible, because there was too much stuff in the vehicle to inventory. To avoid arguing with the senior and respected officer, Mr. Johnston made reference to a search incident to arrest, which both Mr. Johnston and Officer J.M. believed was also legally permissible. Mr. Ketola's summary indicates that Officer J.M. asked Mr. Johnston if he was still planning to tow the vehicle, to which Mr. Johnston replied, "100%." Within minutes of the initiation of the search, Mr. Johnston located suspected methamphetamine. At that point, Officer J.M. agreed that the vehicle should be impounded, despite the large number of items to be inventoried.

Any search after this point would have also been permissible under the motor vehicle exception.

59.    In regard to the Miranda issue, Mr. Ketola's summary correctly points out that Officer J.M. asked if Mr. Johnston should interview A.M. more, while Officer J.M. questioned the female passenger further. In response, Mr. Johnston asked Officer J.M. if he thought that they needed to read A.M. his Miranda warnings before they further questioned him. Mr. Ketola does not address what Officer J.M.'s response was to Mr. Johnston about the Miranda question (suggesting they never asked Officer J.M. about that matter when he was interviewed), and neither officer's body camera footage appears to have caught the answer, if there was one. Mr. Johnston asking the Miranda question of the senior officer establishes the innocent nature of the Miranda issue, and further establishes Mr. Johnston's desire to adhere to the law. As noted by Mr. Ketola, both Mr. Johnston and Officer J.M. appear not to know if Miranda was required. Both Mr. Johnston and Officer J.M. were both under the impression that Miranda was not required because they were questioning A.M. and the female about a matter not related to why A.M. was in custody (a very common and understandable misconception among many law enforcement officers). If Mr. Johnston's interview of A.M. was in violation of Miranda, so was Officer J.M.'s repeated interviews of the female passenger, who was handcuffed and in the rear of Officer J.M.'s vehicle.

60.    In the end, the statements in the A.M. report are factually correct. Mr. Johnston and Officer J.M. worked on the report together, sitting side by side, and Officer J.M. finished and submitted the report (see below). When interviewed by Mr. Ketola about the matter, as noted in Mr. Ketola's memorandum, Officer J.M., who also made reference to them conducting a search incident to arrest during the traffic stop, advised Mr. Ketola he

34

thought he and Mr. Johnston were conducting an inventory search. Both officers clearly were under the impression that they had the legal authority and discretion to conduct either a search incident to arrest or an inventory search. As an aside, while he was literally writing a memorandum that would end Mr. Johnston's career, for allegedly failing to accurately document and summarize information, Mr. Ketola put the wrong time, three times, on the first page, in his memorandum chronologically summarizing Officer J.M.'s body camera footage.

61.     Again, without meaning to be critical of Officer J.M., because police officers make innocent mistakes every day, but rather to illustrate the malicious targeting of Mr. Johnston, as well as the unfair and unequal treatment Mr. Johnston received by the City; as noted by Mr. Ketola, in a memorandum summarizing Officer J.M.'s actions during the arrest, "as the senior officer, Officer J.M. should have been in a position to correct Mr. Johnston if he was making a legal error." Mr. Ketola also advised that Officer J.M. was wrong for not more closely reviewing the police report that Mr. Ketola falsely suggests Mr. Johnston had completed on his own; and Mr. Ketola wrote that he had spoken to Officer J.M. twice before about the accuracy of his report writing (Chief Ketola has never counseled Mr. Johnston on any matter). Officer J.M. also failed to find a knife on the female passenger who he had patted-down, and who had also gotten out of the handcuffs that Officer J.M. had applied before placing her in his patrol car. This security and safety issue with the female passenger, which Mr. Johnston had no fault in, was arguably the most concerning, but again understandable, error during the entire incident.

62.     While the issue at hand is the defamation, malicious targeting, mischaracterization of actions, as well as the unfair and unequal treatment of Mr. Johnston,

in part, if not entirely due to his military service; and not whether Mr. Johnston and Officer

J.M. made procedural or legal errors, understanding and considering the context is not only

fair, but necessary to understand the malicious nature of the City's actions towards Mr.

Johnston. As noted, and/or apparent in a text exchange between Mr. Johnston and Officer

J.M., shortly after the arrest of A.M., during the early morning hours of August 18, 2021,

embedded below as Image 15, Officer J.M. is at the NPD, while Mr. Johnston is lodging A.M.

at the Marquette County Jail. Officer J.M. provided Mr. Johnston with the A.M. incident

number, which Mr. Johnston needed to lodge A.M., which establishes that Officer J.M. had

begun the police report. The report itself indicates that it was entered by Officer J.M. The

text also demonstrates Mr. Johnston's unfamiliarity and inexperience as it relates to the

methamphetamine investigation, supporting the innocent nature of the any mistakes made;

and that Mr. Johnston was looking to the much more experienced officer for guidance,

when Mr. Johnston asked Officer J.M. what the file class for the drug violation was, and to

confirm whether possession of methamphetamine is a felony.

36

**Image 15 (Text between Mr. Johnston and Officer J.M. on August 18, 2021)**



63.      As noted in Mr. Johnston's NPD Daily for August 17-18, 2021, embedded below and identified as Image 16, which is unfinished, because it is the photo of the daily that Mr. Johnston texted to Officer J.M. from the jail in the above text (Image 15), Mr. Johnston was scheduled to work 4:00 p.m., on August 17, 2021 to 4:00 a.m., on August 18, 2021. The daily also notes that Mr. Johnston arrived at the jail, with A.M., at 2:40 a.m., which means that after the booking process and the 15 to 20-minute drive back to NPD, Mr. Johnston would have had 30-40 minutes to process the drug evidence and complete the report before the end of his shift. It is common sense, and a well-established principle, that law enforcement officers should limit the detail they include in a police report, when they

are not in a position to take detailed notes during an incident, and have not had the opportunity to review their body camera footage (in this case 2 ½ hours' worth), which Mr. Johnston did not. As an example of the unfair nature of the hyper-critical review Mr. Grahovic made of the A.M. incident, Mr. Johnston did not have the same three-week luxury that Mr. Grahovic had to write his two-page false memorandum, summarizing a two-minute conversation about the alleged year-old traffic stop lie.

64.    Because Officer J.M. was scheduled to work 3 hours longer than Mr. Johnston (7:00 p.m. to 7:00 a.m.); because he was fully involved in the entire incident; and because he had transported and dealt with the female passenger, Officer J.M. told Mr. Johnston to go home and that he would finish the report. Mr. Johnston recalls Officer J.M. sitting next to him while Mr. Johnston typed his portion of the report and the two of them worked on it together. Mr. Johnston does not recall if the report had "Inventory Search" or "Search Incident to Arrest" when Mr. Johnston left for the day (with the understanding that Officer J.M. would finish and submit the report). Either way, there was never any ill-intention, by either officer, in calling it one type of search, or the other, because both officers clearly thought both were appropriate.

38

**Image 16 (Mr. Johnston's NPD Daily for August 17-18, 2021)**



65.    When Mr. Grahovic wrote his memorandum about the A.M. matter, dated August 31, 2021 (13 days after the incident), Mr. Grahovic made no reference to an inventory search as opposed to a search incident to arrest, and only mentioned the Miranda issue. Mr. Grahovic wrote that, "corrections were made for grammatical errors and flow of content," to the report, but did not mention who revised the report. The revisions were not made by Mr. Johnston, because he had gone home several hours earlier, and the report needed to be provided to the MCPO that morning, because A.M. was in custody.

66.    As to the malicious and false contention that Mr. Johnston had trouble accurately documenting and relaying information, one of Mr. Johnston's Field Training Officers, (initials Officer J.R.), regularly praised Mr. Johnston for his report writing.

67.    Mr. Grahovic claimed in his August 16, 2021 memorandum, in regard to the year-old traffic stop issue, that he had spoken to Mr. Johnston several times about accurately relaying information, both verbally and in writing. Mr. Grahovic advised he had not documented those conversations, "as they were chalked up as isolated incidents which were training points as Officer Mr. Johnston is a very young inexperienced officer." Mr. Johnston and other NPD officers will attest that Mr. Grahovic and Mr. Racine, despite being friends, have vastly different opinions/styles, as to what details need to be, or should be, included in a police report, especially when the incident is recorded. These disagreements have resulted in the two sergeants arguing in front of their subordinates, and has resulted in conflicting guidance.

68.    Every new law enforcement officer is, or should be, counseled on a regular basis as to how they can improve in nearly every area, to include report writing. If not one of those previous incidents and counseling sessions was significant enough to document, whatsoever, it is disingenuous, at best, to then try and combine them to suggest wrong doing. One of the incidents Mr. Grahovic cites in his memorandum was in regard to a missing person. In that incident, Mr. Johnston, Officer J.M. and an Ishpeming police officer all agreed that a missing man might be in medical distress, due to reported health issues. The other officers told Mr. Johnston to make sure Mr. Grahovic, as the department's detective, was briefed on the matter, in case the man was in true medical distress. Mr. Johnston accurately relayed the information to Mr. Grahovic, in front of Officer J.M., but Mr. Grahovic now suggests the information was inaccurate because the man was ultimately found alive. Mr. Grahovic's inclusion of this matter as an example of inaccurately relaying information is groundless and petty, and should be considered in evaluating the remaining

40

malicious allegations. The other two incidents referenced by Mr. Grahovic are also without merit.

69.    As to the false and malicious claim that Mr. Johnston lacks the ability to communicate effectively in writing, during the same week as the A.M. matter, Mr. Johnston authored an 18-page essay for the final class in his Master's program. The essay was about Iran's State-Sponsorship of Terrorism (a very important and complex issue), for which Mr. Johnston received an A. In the same month he was suspended, Mr. Johnston graduated with his Master's degree with a 4.0 GPA.

70.    During the review period that includes August 2021, Mr. Johnston's commanding officer in the U.S. Army Reserves (initials Major M.D.), in regard to Mr. Johnston's service as a Military Intelligence Officer (one of the more difficult and demanding specialties in the U.S. Army), wrote of Mr. Johnston, "1LT Mr. Johnston maintains a high level of respect and professional courtesy when conducting daily business and overcoming conflicts. He demonstrates the Army Values without fail. He can be counted on to provide an honest assessment of situations. He is well organized and can quickly understand new problems. He can quickly produce effective products that assist in communicating mission requirements. 1LT Mr. Johnston performed exceptionally well during this rating period. **1LT Mr. Johnston has shown limitless potential and a high level of intelligence**. He has high competency working needed data along **with excellent written skills when writing intelligence summaries**. He is an ambitious and highly focused officer."

71.    Mr. Grahovic's judgement and professionalism, or lack thereof, is critical to understand when deciding the veracity and motive behind his allegations. Along those

lines, if under oath, Mr. Johnston believes at least two other NPD officers will confirm, unless they understandably fear reprisal, that Mr. Grahovic, who is second in charge at NPD, routinely demeans subordinates (not just Mr. Johnston) by calling them "stupid mother fuckers" when they make mistakes, and telling them to "shut the fuck up and listen" if they try to defend themselves. When Mr. Johnston first started at NPD, Mr. Grahovic repeated a joke that his training officer had told him when he was being trained. The joke was to the effect of, 'Do you want to shoot some cans? Mexi-CANS, Afri-CANS, Puerto Ri-CANS...'

72.     In a September 01, 2021 memorandum, from Mr. Grahovic to Mr. Ketola, written two days after Mr. Johnston was suspended, Mr. Grahovic summarized his interview of Mr. Johnston, on August 12, 2021, in which Mr. Grahovic asked Mr. Johnston if Mr. Johnston felt anyone had been mistreating him due to his military service. During that interview, Mr. Grahovic acknowledges having called Mr. Johnston "Part-Timer" when he returned from his extended military training. Mr. Grahovic told Mr. Johnston that such comments were meant as a joke. Mr. Johnston noted a significant change in the way Mr. Grahovic treated him after his return from his extended military training in March 2021.

73.     Shortly after reporting for his extended military training, Mr. Johnston put Mr. Ketola and Mr. Heffron in for a "Patriot Award," for supporting his extended military absence. While neither Mr. Ketola or Mr. Heffron did anything above what they were required by law to do, at the time, Mr. Johnston was genuinely appreciative that Mr. Ketola did not appear to hold the pending absence against Mr. Johnston before he had left for the training. While at the training, Mr. Johnston and all other officers were encouraged to put their employers in for the award, if appropriate, and Mr. Johnston felt, on the heels of the

42

George Floyd matter (May 2020), that it would be good for the department. Mr. Grahovic was not put in for an award, and neither Mr. Grahovic, or anyone else, had mistreated Mr. Johnston until after he returned from the extended training.

74.    Mr. Johnston believes other NPD officers will confirm under oath, unless they fear reprisal, that Mr. Grahovic repeatedly talked openly about wishing the department did not have any female officers. Mr. Johnston heard Mr. Grahovic make such comments, more than once, during his first month on the department, before the only female on the department (initials Officer "L.D.") left the department. Mr. Johnston was not told why Officer L.D. had left the department, but the rumor around the department was that she had been arrested for drunk driving and refused a chemical test (**absolutely not true**). While Mr. Johnston cannot attribute any false rumors about Officer L.D. to the defendant, it is odd that more than one NPD officer was under the impression that this is why Officer L.D. had left the small department.

75.    In reality, as Officer L.D. is willing to testify, she left the department on an early retirement, in April 2020, after the City of Negaunee maliciously threatened to have the MCPO prosecute her for breaking and entering, after she went into Mr. Ketola's office, using keys she was given by the previous NPD police chief (initials J.F.), to get a piece of paper that had her computer access codes written on them. Similar to the incident with Mr. Johnston, the NPD administration feigned outrage, and took a minor incident that would normally result in verbal counseling, and ended the career of someone that Mr. Grahovic had decided he wanted gone from the department. Officer L.D. will also testify to Mr. Grahovic's reputation for untruthfulness, as well as his anger management issues and lack

of professionalism, which was demonstrated when he would routinely yell at other NPD personnel, to include former NPD Chief J.F.

## COUNT I – VIOLATIONS OF USERRA

76.   The plaintiff restates and realleges as though fully set forth herein paragraphs 1-75 of this complaint.

77.   The defendants discriminated against and retaliated against Mr. Johnston because of his military service in the ways described above including, but not limited to, the following:

    A.   Extending his probationary period;

    B.   Denying him union representation and his substantive and procedural due process rights before termination, including an opportunity to contest or appeal his termination;

    C.   Giving him unjustified and groundless punishment;

    D.   Denying him benefits and pay that he would have received had he completed his probationary period;

    E.   Presenting false, false light, and misleading information to a prosecuting attorney, which caused the prosecuting attorney to issue a Giglio/Brady letter to Mr. Johnston, effectively destroying his law enforcement career;

    F.   Terminating his employment;

    G.   Not properly calculating his senority.

78.   As a result of the violations set forth above the plaintiff has suffered and will continue to suffer he damages set forth above.

44

79.    The conduct of the defendants' violated USERRA, 38 U.S.C. § 4301 et. seq.

80.    The defendants violations set forth above were willful.

WHEREFORE, the plaintiff Adam Johnston requests a judgment against the defendants in an amount equal to any wages, salary, employment benefits, interest and any other compensation and monies denied or lost to him by reason of the defendant's violations of the USERRA, 38 U.S.C. § 4301 et. seq.; an equal amount of the above as liquidated damages, all recoverable interest, all equitable relief that may be appropriate, including that the Giglio/Brady letter issued by the prosecuting attorney be rescinded and withdrawn, and front pay, and all attorney's fees, costs and any other relief this court deems fair and just.

## COUNT II – DUE PROCESS VIOLATIONS

81.    The plaintiff restates and realleges as though fully set forth herein paragraphs 1-80 of this complaint.

82.    The plaintiff passed his probationary period with the City of Negaunee.  He had a property interest in continuous employment with it.

83.    The defendants did not give the plaintiff an opportunity to be heard regarding his dismissal, much less contest it or appeal it.

84.    The defendants could not reasonably have believed that they could terminate Mr. Johnston's employment without giving him the minimal due process protections of allowing him to be heard regarding the dismissal or challenging or appealing it in any way including, but not limited to,  through arbitration.

45

85.    The individual defendants could not reasonably have believed that they could terminate Mr. Johnston's employment without giving him notice and an opportunity to be heard regarding the merits of it in any forum.

86.    The conduct of the defendants violates the 14th Amendment to the constitution of the United States.

87.    This matter is actionable under 42 U.S.C. § 1983.

88.    As a result of the actions of the defendants, Mr. Johnston has suffered and will continue to suffer the damages set forth above.

WHEREFORE, the plaintiff Adam Johnston request a judgment against the defendants for whatever amount is sufficient to compensate him for his injuries and damages plus punitive damages against the individual defendants, all recoverable interest, attorneys fees under 42 U.S.C. § 1988, and any other relief this court deems fair and just.

## COUNT III – EQUAL PROTECTION VIOLATIONS

89.    The plaintiff restates and realleges as though fully set forth herein paragraphs 1-88 of this complaint.

90.    The defendants' termination of Mr. Johnston's employment because of retaliation against his military service is not rationally related to any legitimate government interest.

91.    The reasons given by the defendants for terminating Mr. Johnston's employment were false and pretextual.

46

92.     The individual defendants could not reasonably have believed that their conduct was within the constitutional limitations in the exercise of their authority under the Fourteenth Amendment to the constitution of the United States.

93.     Similarly similar officers were not given any discipline for similar or more serious conduct that the defendants claimed they terminated Mr. Johnston's employment for.

94.     This claim is actionable under 42 U.S.C. § 1983.

95.     As a result of the conduct set forth above, the plaintiff has suffered and will continue to suffer the damages set forth above.

WHEREFORE, the plaintiff Adam Johnston request a judgment against the defendants for whatever amount is sufficient to compensate him for his injuries and damages plus punitive damages against the individual defendants, all recoverable interest, attorneys fee under 42 U.S.C. § 1988, and any other relief this court deems fair and just.

Dated: May 5, 2023                     WILLIAM F. PIPER, PLC.
                                       Attorney for Plaintiff

                                       By:     _/s/ William F. Piper_____
                                               William F. Piper (P38636)
                                       BUSINESS ADDRESS:
                                               1611 West Centre Ave., Ste 209
                                               Portage, Michigan 49024
                                               Phone: 269.321.5008
                                               Fax: 269.321.5009